**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2202
_____

In re: OPUS EAST LLC, et al.,
Debtors

JEOFFREY L. BURTCH, Chapter 7 Trustee for the Estate of Opus East LLC,
Appellant

v.

OPUS LLC, a Minnesota limited liability company; OPUS CORP, a Minnesota corporation; OPUS FOUNDATION; GERALD RAUENHORST 1982 IRREVOCABLE TRUST, f/b/o Grandchildren and the Gerald Rauenhorst 1982 Irrevocable Trust f/b/o Children; KEITH P. BEDNAROWSKI, Trustee; LUZ CAMPA, as Trustees thereof; OPUS REAL ESTATE VII, LP; OPUS REAL ESTATE VIII, LP; MARK RAUENHORST, individually; KEITH P. BEDNAROWSKI, individually; LUZ CAMPA, individually; ADLER MANAGEMENT LLC; MARSHALL M. BURTON, individually; OPUS PROPERTY SERVICES LLC; OPUS 2 LLC; OPUS ARCHITECTS & ENGINEERS PC; OPUS ARCHITECTS & ENGINEERS INC; OPUS CORE LLC; OPUS NORTHWEST LLC; OPUS DESIGN BUILD LLC; OPUS DEVELOPMENT CORP; OPUS HOLDING LLC; OPUS HOLDING INC.; OPUS AE GROUP INC.
_____

On Appeal from the United States District Court for the
District of Delaware
(D.C. No. 1-15-cv-00346)
District Judge: Honorable Richard G. Andrews

Argued: January 26, 2017

Before: CHAGARES, RESTREPO, and ROTH, Circuit Judges.

(Opinion Filed: September 28, 2017)

Steven D. Sanfelippo    (Argued)
Cunningham Swaim
7557 Rambler Road
Suite 400
Dallas, Texas 75231

    *Counsel for Appellant*

Dennis M. Ryan       (Argued)
W. T. Roberts, III
Jane E. Maschka
Faegre Baker Daniels
90 South 7th Street
2200 Wells Fargo Center
Minneapolis, MN 55402

    *Counsel for Appellee*

_____

OPINION*
_____

CHAGARES, <u>Circuit Judge</u>.

Appellant Jeoffrey L. Burtch, Trustee (the "Trustee") for Opus East LLC ("Opus East") — the debtor in the underlying bankruptcy action — appeals from the District Court's decision affirming the judgment of the Bankruptcy Court, <u>In re Opus East, LLC v. Opus, LLC</u>, 528 B.R. 30 (Bankr. D. Del. 2015). He challenges the Bankruptcy Court's findings pertaining to Opus East's insolvency and his breach of fiduciary duty claim against Opus East's chairman. For the reasons that follow, we will affirm.

_____

    * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

## I.[1]

## A.

Opus East is a Delaware limited liability company formed on September 14, 1994, to develop and sell commercial real estate projects in the Northeastern and Mid-Atlantic United States. It belonged to a network of real estate companies, referred to as Opus Group, which were owned by two trusts ("Trusts") created for the benefit of founder Gerald Rauenhorst's children and grandchildren. Opus East was a subsidiary of Opus LLC, one of the Trusts' two holding companies.

Opus East owned a series of entities ("special purpose entities" or "SPEs") formed for each real estate project Opus East developed. The holding companies and their subsidiaries were each independent legal entities with their own management, financing, and accounting department. During most of the relevant time, appellee Mark Rauenhorst ("Rauenhorst"), Gerald Rauenhorst's son, was chairman of Opus LLC and Opus East.

Opus East was required to make annual distributions from its profits to Opus LLC, which, in turn, made distributions to the Trusts. Opus East received financing through loans from OUS TFC, LLC and Opus Financial, LLC, two other subsidiaries of the Trusts; its own credit line with Bank of America; and various project-specific financing from outside banks. According to the Bankruptcy Court, between 1994 and 2008 Opus East's equity grew from $12 million to $75 million. Opus East began to struggle during

---

[1] Because we write only for the parties we assume their familiarity with the record and recount only those facts necessary to our disposition.

the market collapse of 2008 when it became difficult to find buyers for its developments or obtain financing to complete new projects.

## B.

The Bankruptcy Court concluded that Opus East became insolvent on February 1, 2009. That is when the company realized that it would be unable to close on a $93 million real estate project — the "100 M Street Project"[2] — which Opus East had anticipated would salvage the company's faltering profitability. In support of its conclusion that insolvency did not occur earlier, the Bankruptcy Court found that Opus East was able to pay off creditors as late as August 2008 without liquidating any of its assets, sell projects at more-than-liquidation value through the third quarter of 2008, and obtain loans from related entities as of November 2008.

## C.

In 2004, Opus East created Maryland Enterprises, LLC ("ME"), an SPE, to bid on a project for the United States General Services Administration ("GSA"). The GSA sought the construction of an office for the National Oceanic and Atmospheric Administration ("NOAA Project"). ME submitted a proposal and was awarded the contract in March 2005. The project became an albatross; ballooning construction costs, change orders from the GSA, and disagreements with the GSA led ME to cease construction on the NOAA Project in December 2008.

---

[2] The 100 M Street Project was a Washington, D.C. development for which Opus East had secured a buyer prior to the 2008 financial collapse.

The GSA proposed a settlement on the contract in March 2009 which ME rejected as insufficient. By April, Opus East defaulted on a bank loan financing the construction and decided to abandon the project. In May 2009, ME sued the GSA over alleged breaches of the NOAA Project contract.

Opus East contends that it unsuccessfully attempted to sell the NOAA Project. In anticipation of bankruptcy, the Trusts created and invested $100,000 into GAMD LLC ("GAMD"), an entity which then acquired ME from Opus East in exchange for $100,000 and an interest in the first $400,000 of any proceeds realized from the GSA lawsuit. As a beneficiary of the Trusts and director of Opus East, Rauenhorst stood on both sides of this transaction.

A third-party company signed a letter of agreement with Opus East, prior to bankruptcy, indicating its interest in the possible acquisition of ME, although it ultimately decided against pursuing the deal. GAMD spent over half a million dollars pursuing ME's lawsuit against the GSA but did not recover any damages.

D.

Opus East filed for Chapter 7 bankruptcy on July 1, 2009. In 2011, the Trustee commenced the current adversary action against Opus Group. On March 23, 2015, following a two-week trial, the Bankruptcy Court ruled in favor of Opus Group with respect to sixty of the sixty-seven counts alleged by the Trustee. The Trustee appealed to the District Court, which affirmed the Bankruptcy Court's ruling on March 31, 2016. The Trustee timely appealed to this Court.

II.[3]

On appeal, the Trustee challenges: 1) the Bankruptcy Court's determination that Opus East was solvent through February 1, 2009; and 2) its conclusion that Mark Rauenhorst did not breach his fiduciary duty with respect to the transfer of Opus East's assets to GAMD.

A.

Our review of the District Court's order is plenary, and we use the same standard as the District Court in reviewing the decision of the Bankruptcy Court. Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 353 (3d Cir. 2002). Thus, we review the Bankruptcy Court's findings of fact for clear error. Brown v. Pa. State Emps. Credit Union, 851 F.2d 81, 84 (3d Cir. 1988). Clear error occurs only if the court's finding is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." Coffey, 300 F.3d at 353 (citation omitted). We review the court's legal determinations de novo, In re Am. Classic Voyages Co., 405 F.3d 127, 130 (3d Cir. 2005), and exercise plenary review over the court's "interpretation and application of [the] facts to legal precepts," In re CellNet Data Sys., Inc., 327 F.3d 242, 244 (3d Cir. 2003).

B.

1.

---

[3] The District Court had jurisdiction to review the Bankruptcy Court's order pursuant to 28 U.S.C. § 158(a), and we have jurisdiction to review the District Court's order under 28 U.S.C. §§ 158(d) and 1291.

In its petition to the Bankruptcy Court, the Trustee sought to recover certain transfers that it claimed occurred after Opus East's insolvency. The Trustee bears the burden of proving Opus East's insolvency by a preponderance of the evidence. See In re Fruehauf Trailer Corp., 444 F.3d 203, 211 (3d Cir. 2006). There are three tests for determining whether an organization is insolvent at a given point in time: the balance sheet test, the cash flow test, and the inadequate capital test.

Under the balance sheet test, a debtor is insolvent if the sum of its liabilities is greater than the sum of its assets, at fair valuation. 11 U.S.C. § 101(32)(A); In re R.M.L., Inc., 92 F.3d 139, 154-55 (3d Cir. 1996). "Fair valuation" is determined by valuing the debtor's assets on either a going concern or liquidation basis; the latter is only appropriate where bankruptcy is "clearly imminent" and the "business is on its deathbed." Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1067 (3d Cir. 1992) (citations omitted); see also In re Am. Classics Voyages Co., 367 B.R. 500, 508 (Bankr. D. Del. 2007) (explaining that liquidation valuation is inappropriate unless the business is "wholly inoperative, defunct or dead on its feet" (citations omitted)). Going concern value is determined by looking at an asset's "market value," analyzed in a "realistic framework" that accounts for the "amounts [of cash] that can be realized in a reasonable time assuming a willing seller and a willing buyer." In re Trans World Airlines, Inc., 134 F.3d 188, 193-94 (3d Cir. 1998) (quotation marks and citations omitted); see also id. at 195 (defining "reasonable time").

A debtor is cash flow insolvent if, at the time a transfer is made, the debtor intended to incur, or believed or reasonably should have believed that it would incur,

7

debts beyond its ability to pay as they came due. 11 U.S.C. § 548(a)(1)(B)(ii)(III); In re EBC I, Inc., 380 B.R. 348, 359 (Bankr. D. Del. 2008). This "forward looking" test requires assessing the debtor's reasonable prediction about its ability to repay a debt as it is incurred. See In re Teleglobe Commc'ns Corp., 392 B.R. 561, 602-03 (Bankr. D. Del. 2008). A court may, however, take into account whether the debtor was "able to pay, intended to pay, and . . . was paying its debts as they came due." EBC I, 380 B.R. at 359.

Under the inadequate capital or unreasonably small capital test, a debtor is insolvent if it "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II). An entity has unreasonably small capital if it lacks the ability to generate sufficient profits to sustain operations. Peltz v. Hatten, 279 B.R. 710, 744-45 (D. Del. 2002) (citing Moody, 971 F.2d at 1070). In other words, insolvency occurs after a transfer "that leave[s] the debtor technically solvent but doomed to fail." MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995). Generally, "courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction." In re Joy Recovery Tech. Corp., 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002).

2.

At trial the Trustee's expert, Quentin Mimms, opined that Opus East's financial statements and projections, from about 2006 onward, were unreasonable and failed to account for a number of risks and other liabilities. The Bankruptcy Court discredited his

8

opinion and found sufficient evidence supporting Opus Group's competing, more optimistic valuations. According to the court, Opus East was not insolvent under any test until February 1, 2009, after the failure of the 100 M Street Project.

On appeal, the Trustee assembles an array of evidence he contends supports Mimms' adjustments and undermines the Bankruptcy Court's insolvency conclusions. We address some of his specific arguments below, but at base, the Trustee fails to sustain his burden of showing that the Bankruptcy Court's opinion was lacking in evidentiary support. For this reason, we will affirm.

a.

The Trustee argues that Opus East was balance sheet insolvent by June 30, 2008. In finding otherwise, the Bankruptcy Court found Opus Group's higher valuation of the debtor's assets to be more credible, noting that through 2008 Opus East was able to pay creditors without liquidating any assets, as projected, and was able to sell assets at greater-than-liquidation value.[4] The court also found that Opus East was entitled to rely on anticipated profits from the 100 M Street Project.

---

[4] The parties dispute whether Mimms used a liquidation — rather than going concern — value in his analysis. The Trustee maintains that Mimms used a going-concern value but applied a "liquidation discount" to certain assets. Mimms's testimony at trial, however, suggests otherwise. See, e.g., Appendix ("App.") 384-85 ("Q. So [these are the] types of factors that you considered in arriving at a liquidation premise of value for the real estate? . . . [A.] Absolutely. Q. Okay, once you decided and determined that liquidation value should be applied to the real estate holdings as opposed to a going concern value, what's the next step in your analysis at arriving at balance sheet insolvency?" A. Well, the next step . . . ."); App. 392-93 (similar testimony). We cannot fault the Bankruptcy Court for relying on Mimms's own explanation of his analysis. In any event, we need not resolve this dispute because it does not impact our consideration

9

The Trustee disputes Opus Group's analysis and the Bankruptcy Court's reliance on it on several bases. He first attacks the usefulness and accuracy of pre-2009 reports issued by Opus East's third-party auditor, reports which the court found to bolster Opus Group's valuations. But evidence shows that more recently the auditor determined, ex-post, Opus East's 2007 and 2008 financial statements to be sound. And any concern with the auditor's findings is mitigated by Opus Group's assertion, credited by the Bankruptcy Court, that the audit reports were only part of its independent analysis of Opus East's financial condition.

The Trustee also disputes the relevancy of Opus East's ability to sell assets and obtain loans, contending that the assets were sold to related parties and that the loans were secured by and limited to funding project-specific real estate. Neither assertion, however, suggests that any transaction was unfair, nor that the Bankruptcy Court should have disregarded the debtor's access to credit when assessing its continuing solvency.

According to the Trustee, outstanding notes held by related entities should have been factored into Opus East's liabilities. Evidence supports the Bankruptcy Court's finding, however, that no demand had been made on the notes and that there was no reason to believe in 2008 that demand was forthcoming.

Finally, the Trustee argues that the Bankruptcy Court placed undue weight on the profits anticipated from the 100 M Street Project given the unfavorable market and the Project's souring prospects. Although some Opus East executives were concerned about

_____

of whether there is sufficient evidence supporting the Bankruptcy Court's conclusion that the Mimm's valuations were not credible.

10

the Project's possible failure, this does not undermine the Bankruptcy Court's finding that nevertheless Opus East did not <u>know</u> that it must abandon the Project prior to February 2009.  Accordingly, the Trustee fails to show clear error in the Bankruptcy Court's balance sheet insolvency analysis.

b.

The Trustee asserts that Opus East was cash flow insolvent as early as December 2006.  At that time, according to the Trustee, Opus East was saddled with unrealistic spending commitments and unreasonably relied on its ability to obtain credit, including insider and third-party loans, to cover construction obligations.  We see no reason, however, why Opus East could not rely on its continued access to insider credit when forecasting its ability to pay debts.  Cf. <u>Teleglobe Comm'cns Corp.</u>, 392 B.R. at 603 (finding that the debtor was not cash-flow insolvent in part because it could rely on financial support from its parent company).  As for spending commitments, the Trustee's altered projections are not sufficiently supported to warrant setting aside the Bankruptcy Court's conclusion that, from 2006–2008, Opus East's cash flow forecasts were reasonable, especially considering that the Trustee's post-hoc projections diverge from what actually transpired.

c.

Finally, the Trustee contends that the Bankruptcy Court erred in concluding that Opus East was sufficiently capitalized through 2009.[5]  In support, he cites, <u>inter alia</u>, the

---

[5] The Trustee makes two general arguments which are unavailing.  First, the Trustee argues that assessment of the debtor's capital must be made without regard to the

debtor's 2006 projected cash flow shortage which delayed the commencement of certain projects, the number of construction commitments in 2007 and 2008 for which the company lacked cash to complete, tightening credit markets in 2007, and the fact that Opus East had weaker liquidity ratios than many of its peers.

The evidence shows that Opus East faced financial difficulties in 2007 and 2008 but fails to account for the fact that Opus East continued selling and developing projects, paying creditors, and obtaining loans notwithstanding those difficulties, as the Bankruptcy Court found. That Opus East adjusted projections downward as 2007 unfolded, is not dispositive as to whether the projections were reasonable at the time they were made. Moreover, any inadequacies in the debtor's projections should be balanced by its ensuing ability to cope with unexpected shortfalls. Cf. Moody, 971 F.2d at 1073 ("The critical question is whether the parties' projections were reasonable[, which] must be tested by an objective standard anchored in the company's actual performance."). The Bankruptcy Court did not clearly err in finding that, in 2006, Opus East reasonably

---

debtor's ability to obtain additional loans "because replacing one creditor with another is not a substitute for adequate capital." Trustee's Br. 37. But we have readily considered access to credit when determining whether an entity is undercapitalized. Moody, 971 F.2d at 1072-73 ("We cannot say that [the debtor] was left with an unreasonably small capital merely because . . . its sole source of operating capital was its [third-party] line of credit. . . .").

Second, the Trustee contends that Opus East could not have become insolvent on the same day regardless of the measurement used — as the Bankruptcy Court found — because undercapitalization necessarily precedes the other circumstances constituting insolvency. Whether or not this is true, the burden remains with the Trustee to prove when undercapitalization occurred. In the absence of sufficient evidence otherwise, we cannot say that the Bankruptcy Court clearly erred when concluding that a single negative event — here, the failure of the 100 M Street Project — triggered the company's insolvency under any of the tests.

believed that it would continue to have adequate cash and capital notwithstanding the risks it faced.[6]

Because the Bankruptcy Court's findings are not "completely devoid of minimum evidentiary support," see Coffey, 300 F.3d at 353, we agree with the District Court that the Bankruptcy Court did not clearly err in concluding that Opus East remained solvent until February 1, 2009. Accordingly, we will affirm.

C.

1.

The Trustee also challenges the Bankruptcy Court's conclusion that Rauenhorst did not breach his fiduciary duty to Opus East when he authorized the transfer of ME to GAMD on the eve of Opus East's bankruptcy.[7]

---

[6] The Trustee argues that the Bankruptcy Court erred in discrediting Mimms's analysis. But the Bankruptcy Court was entitled to accord as much weight to the opinion as it thought was deserved. We see no clear error in the court's determination that Mimms's adjusted capitalization calculations failed to consider the debtor's access to insider credit, was tainted with hindsight bias, and relied on comparisons to companies which operated in materially different ways.

[7] Whether Rauenhorst breached his fiduciary duties is a question of fact, and is thus reviewed for clear error. See Huber v. Taylor, 469 F.3d 67, 81 (3d Cir. 2006). The parties do not dispute, and we agree, that Delaware law governs these claims.

As an initial matter, the Bankruptcy Court found that the terms of Opus East's LLC Agreement modified the fiduciary duties owed by Rauenhorst. The District Court disagreed, concluding that the LLC Agreement only imposed less stringent duties where Rauenhorst complied with a prescribed process before taking action on behalf of the company. We need not settle this issue because we conclude that the Bankruptcy Court did not clearly err in finding alternatively that, regardless of whether a more lenient standard applied, the Trustee's claims failed under even traditional fiduciary duty standards.

13

Under Delaware law a director owes his company the fiduciary duties of care, loyalty, and good faith. Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993). A fiduciary violates the duty of care when he is grossly negligent. United Artists Theatre Co. v. Walton, 315 F.3d 217, 231 (3d Cir. 2003). This includes a failure to inform himself of "all material information reasonably available" before making a business decision. Id. at 232 (quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)).

The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." Cede & Co., 634 A.2d at 361. A plaintiff alleging a breach of this duty need only show that the director was on both sides of a challenged transaction. In re The Brown Schs., 386 B.R. 37, 47 (Bankr. D. Del. 2008) (citation omitted). The burden then shifts to the director to "demonstrat[e] the entire fairness of the transaction." William Penn P'ship v. Saliba, 13 A.3d 749, 756 (Del. 2011).

Entire fairness has two elements: "fair dealing and fair price." Id. Evidence of fair dealing includes the use of an arm's length bargaining process, Kahn v. Lynch Comm'n Sys., Inc., 669 A.2d 79, 82 (Del. 1995), and reliance on accurate and complete information, e.g., Valeant Pharms. Int'l v. Jerney, 921 A.2d 732, 748 (Del. Ch. 2007). Fair price "relates to the economic and financial considerations of the proposed merger." Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983). The entire fairness standard is "exacting," and requires the director to show that the deal was objectively fair, not just

that he believed it to be so.  See In re Marvel Entm't Grp., Inc., 273 B.R. 58, 78 (D. Del. 2002).

The duty of good faith requires "true faithfulness and devotion to the interests of the corporation."  In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 67 (Del. 2006).  This duty is breached when, for example, "the fiduciary intentionally acts with a purpose other than that of advancing the [corporation's] best interests, . . . acts with the intent to violate applicable positive law, or . . . intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  Id.

2.

The Bankruptcy Court found that Rauenhorst did not violate any of these duties when orchestrating the GAMD transfer, and the Trustee fails to show that this decision was clear error.

First, the Bankruptcy Court credited Rauenhorst's testimony that he had "numerous" discussions about the status of the NOAA Project, was informed about the GSA litigation, and was aware of the unpromising search for a buyer for ME.  Given this supporting evidence, we defer to the Bankruptcy Court's finding that Rauenhorst was not "grossly negligent" in approving the GAMD transfer, and thus did not violate his duty of care.

15

Second, evidence supports the Bankruptcy Court's conclusion that the transaction was entirely fair.[8] Multiple Opus Group executives from various entities were involved in planning the transaction, and Opus East officers retained outside counsel to advise on the transfer before its execution. As for "fair price," Rauenhorst and other executives were well-apprised of ME's limited worth, which the Bankruptcy Court found supported by the fact that Opus East struggled to solicit buyers for the deal and that absent a transfer Opus East would have been encumbered with a project it could not afford and a lawsuit it likely would not win. We conclude that it did not clearly err by finding that Rauenhorst satisfied his duty of loyalty.

Third, Rauenhorst's testimony supports the Bankruptcy Court's finding that he did not intentionally or consciously disregard his duty to Opus East and that he believed the transaction to be in the company's best interests. More must be shown than a "questionable or debatable decision on [the] part [of the director]" to establish a lack of good faith. See Zucker v. Hassell, Civ. No. 11625, 2016 WL 7011351, at *12 (Del. Ch. Nov. 30, 2016) (citations omitted). The Trustee fails to adduce any such evidence. Accordingly, it was not clear error for the Bankruptcy Court to find that Rauenhorst satisfied his duty of good faith.[9]

III.

---

[8] The parties do not dispute that Rauenhorst, as director of Opus East and beneficiary of GAMD's parent company, was conflicted in the transaction, and thus that it was Opus Group's onus to demonstrate the deal's entire fairness.

[9] We have considered the remainder of the Trustee's arguments and conclude that they are all without merit.

16

For the foregoing reasons, we will affirm the judgment of the District Court.