**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. NC-18-1232-BSTa |
| BLUE EARTH, INC., | Bk. No. 3:16-bk-30296-DM |
| Debtor. | Adv. No. 3:17-ap-03063-DM |
| BRADLEY D. SHARP, Chapter 11 Liquidation Trustee, | |
| Appellant, | |
| v. | **MEMORANDUM**<sup>*</sup> |
| INTRACOASTAL CAPITAL, LLC; ANSON INVESTMENTS MASTER FUND LLP, | |
| Appellees. | |

Argued and Submitted on June 20, 2019
at Sacramento, California

Filed – October 2, 2019

---

<sup>*</sup> This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Dennis Montali, Bankruptcy Judge, Presiding

---

Appearances:     Howard Troy Romero of Romero Park P.S. argued for
appellant Bradley D. Sharp, Chapter 11 Liquidation
Trustee; Michael Benz of Chapman and Cutler LLP
argued for Appellee Anson Investments Master Fund,
LLP; Scott Mendeloff of Greenberg Traurig, LLP argued
for Appellee Intracoastal Capital, LLC.

---

Before:     BRAND, SPRAKER and TAYLOR, Bankruptcy Judges.

## INTRODUCTION

Bradley D. Sharp appeals (1) an order granting appellees' motions to dismiss his first amended complaint to avoid and recover alleged constructive fraudulent transfers[1] to appellees, and (2) an order denying reconsideration of that decision. Although we agree that Sharp's first amended complaint failed to plead plausible claims against appellees, we believe that the bankruptcy court should have granted him leave to amend. Accordingly, we AFFIRM in part, REVERSE in part, and REMAND.

////

---

[1] Sharp also alleged claims for actual fraudulent transfer, which the bankruptcy court also dismissed. He does not appeal that ruling.

2

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.     Background of the parties and the alleged fraudulent transfers

Blue Earth, Inc. ("BEI") was a provider of alternative and renewable energy solutions for small and medium-sized commercial facilities. BEI filed a chapter 11[2] bankruptcy case on March 21, 2016. Sharp ("Trustee") is the trustee of the litigation trust that was established to investigate and prosecute causes of action for the benefit of the litigation trust beneficiaries.

The following facts are as alleged by Trustee. During an expansion period for BEI, the company was in constant need of cash infusions to fund its operations and the operations of its subsidiaries until the entities could develop projects and become profitable. BEI raised the necessary capital through a combination of equity sales and loans. By October 2015, BEI's financial outlook was bleak. The company was borrowing funds from its officers and directors to meet basic obligations, such as payroll.

To raise capital to avoid a default on a secured loan that could have precipitated BEI's bankruptcy, BEI turned to one of its shareholders, Intracoastal Capital, LLC ("Intracoastal"), and a new investor, Anson Investments Master Fund, LLP ("Anson"). On October 16, 2015, BEI entered into Securities Purchase Agreements with Intracoastal and Anson (the

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

3

"SPAs"). In exchange for $2,000,000 from each investor, each investor would receive 4,000,000 shares of BEI common stock, 6-month warrants to purchase an additional 4,000,000 common stock shares for $0.50 per share, and five-and-a-half year warrants to purchase an additional 4,000,000 common stock shares for $0.83 per share. Intracoastal's and Anson's respective $2,000,000 investments closed on October 20, 2015.

Just days after the SPAs closed, BEI, Intracoastal and Anson agreed to undo the transactions. On October 27, 2015, Intracoastal and Anson each executed an "Exchange Agreement" with BEI, which effectively reversed the SPAs. In exchange for the return of the 4,000,000 shares and warrants Intracoastal received, BEI paid Intracoastal $2,000,000, plus an additional $200,000, $10,000 in legal fees, and a five-year warrant to purchase 1,500,000 shares at $0.55 per share. In exchange for the return of the shares (less a small amount it had already sold) and warrants Anson received, BEI paid Anson $2,003,419, plus a five-year warrant to purchase 1,500,000 shares at $0.55 per share. These "Exchange Agreement" transfers are the basis of Trustee's claims against Intracoastal and Anson.

By the time of the Exchange Agreements, BEI had already spent the $4,000,000 it raised through the SPAs on existing debts. Thus, to finance the stock repurchase, BEI had to borrow $4,900,000 from Jackson Investment Group, LLC ("JIG"), one of BEI's largest shareholders and a senior lender. The loan was evidenced by a 9% Senior Secured Note due in two months

4

on December 23, 2015. BEI filed for bankruptcy five months after the Exchange Agreements.

**B.      Trustee's original complaint and the motions to dismiss**

In his original complaint against Intracoastal and Anson (together, "Defendants"), Trustee alleged that the Exchange Agreements constituted constructive fraudulent transfers under § 548(a)(1)(B). He sought to avoid the transfers and recover $2,210,000 from Intracoastal and $2,003,419 from Anson, the amounts Defendants received from BEI under the Exchange Agreements, plus pre- and post-judgment interest.

Defendants moved to dismiss Trustee's original complaint, arguing that Trustee's insolvency allegations were conclusory and contradicted public information and BEI's own statements concerning its solvency at the time of the Exchange Agreements. Specifically, BEI had represented in the Exchange Agreements that it was financially healthy, and BEI's Form 10-Q dated September 30, 2015, just weeks before the Exchange Agreements, reflected that BEI had nearly $80,000,000 in assets over liabilities (e.g., assets of nearly $100,000,000 versus liabilities of just over $21,000,000). Lastly, Defendants argued that Trustee conceded BEI was solvent at the time, because he alleged that BEI was able to secure a loan from JIG for the purpose of funding the transfers.

In opposition, Trustee argued that even if he could not establish insolvency under § 548(a)(1)(B)(ii)(I), he could still prevail on his claim if

5

BEI was (a) engaged in business or a transaction for which any property remaining with it was unreasonably small, or (b) if BEI intended to incur or believed that it would incur debts beyond its ability to pay as they matured. § 548(a)(1)(B)(ii)(II), (III). Trustee requested leave to amend the complaint if additional facts were necessary.

The bankruptcy court held two hearings on the motions to dismiss the original complaint. At the first hearing, the court indicated that Trustee had sufficiently pled BEI's insolvency. By the second hearing, the court had reconsidered and told him that ¶¶ 41-43 of the complaint were insufficient for pleading the three alternative grounds for establishing insolvency under § 548(a)(1)(B)(ii)(I)-(III); they simply parroted the statutory language. Ultimately, the court granted the motions to dismiss with leave to amend:

> THE COURT: Mr. Powell, I'm going to stick with that [ruling]. I think with my thinking that insolvent, do you mean balance sheet insolvent? Do you mean cash flow insolvency? You know, were they -- were their revenues such that they couldn't pay their debts as they become due and, again, just state it. You can't just restate the definition. I do think for you to file the complaint and state that BEI was insolvent, you have to have some basis, and I don't think it's a high bar here. . . . .

Hr'g Tr. (Mar. 26, 2018) 8:1-9.

## C. Trustee's first amended complaint and the motions to dismiss

Trustee then filed his first amended complaint ("FAC"). To bolster his allegation that BEI was insolvent at the time of the Exchange Agreements,

6

Trustee added the following:

¶ 38. At the time of the Transfers, BEI suffered from unmanageable indebtedness. But for the funds it received pursuant to the October 16 SPAs, it would have defaulted on a secured loan that would have necessitated it immediately filing for bankruptcy protection;

¶ 39. BEI did not have sufficient funds to continue developing its works in progress. Such projects were needed to finally generate income streams for the company;

¶ 40. On October 15, the day before the SPAs were finalized, BEI had a monthly 'burn rate' of $900,000, an amount that had to be raised monthly to meet its debts. This was a 50% increase in the 'burn rate' since September;

¶ 42. As a result of the Transfers, BEI was left without meaningful cash reserves to pay its debts as they became due, and the Exchange Agreements ultimately contributed significantly to BEI declaring bankruptcy;

¶ 43. Apart from being cash-flow insolvent, BEI was also balance sheet insolvent at the time of the Transfers or became insolvent as a result thereof. Despite the company's disclosures during the relevant timeframe, its financial statements contained various accounting errors that resulted in a grossly overstated value of the company's assets. For example, BEI accounted for non-binding letters of intent on unfunded renewable energy projects as assets worth millions of dollars;

¶ 44. BEI proceeded with the Exchange Agreements with knowledge of the company's serious financial problems and of the

7

prejudice to creditors caused by trading $4 million in cash for over $5 million in debt;

¶ 53. As noted above, BEI was insolvent at the time of the Transfers or became insolvent as a result thereof. It no longer had the ability to pay debts as they came due and the value of its liabilities exceeded its actual assets;

¶ 54. The Transfers also left BEI with an unreasonably small amount of capital with which to engage in its business. It had to turn to its existing shareholders and creditors for funds to keep the company on life support. After a few unsuccessful months without capital needed to engage in business BEI filed for bankruptcy;

¶ 55. At the time of the Transfers, BEI was engaged in business or was about to engage in business for which any property remaining with BEI was an unreasonably small amount of capital. Indeed, one of its primary investment models was to fund capital-intensive renewable energy systems. Such projects required significant sources of construction and project financing, and BEI had an unreasonably small amount of property to engage in its business;

¶ 56. At the time of the Transfers, BEI intended to incur, or believed it would incur, debts that would be beyond BEI's ability to pay as such debts matured. After all, it transferred nearly all its cash assets to Anson and Intracoastal pursuant to the Exchange Agreements while knowing that it would continue incurring debts in operation of its business that would [be] beyond its ability to pay.

Defendants moved to dismiss the FAC, arguing that it too failed to

state plausible constructive fraudulent transfer claims. Defendants argued that Trustee's allegations of BEI's cash-poor condition were conclusory and did not differentiate BEI's circumstances and cash position at the time of the Exchange Agreements from any other point in time in its existence. Further, they argued that the FAC contained no facts to support the allegation that BEI had no access to cash at the time of the Exchange Agreements. To the contrary, Defendants maintained that BEI's ability to obtain cash was demonstrated by a subsequent loan from JIG in December 2015 — BEI obtained $2,000,000 in additional financing, got an extension on the $4,900,000 million loan to repurchase the stock from Defendants, and paid JIG a 3% transaction fee. BEI also continued to make timely interest payments on the JIG loans until late February 2016.

Next, Defendants argued that the FAC was silent as to BEI's assets and liabilities; there was no factual allegation that BEI's liabilities exceeded its assets or any allegation as to BEI's assets other than cash. In addition, Trustee failed to allege any facts to support his conclusory allegation that BEI's financial statements contained "accounting errors" which inflated the value of its assets; he cited vaguely to only the alleged improper inclusion of non-binding letters of intent involving "millions of dollars" among the company's assets. Defendants opposed any further leave to amend.

In opposition, Trustee maintained that he had sufficiently pleaded insolvency, which he argued the court said was a "low bar" for pleading

9

purposes. Trustee argued that BEI was both balance sheet and cash flow insolvent at the time of the transfers. He further argued that BEI's access to credit after executing the Exchange Agreements was a factual determination that could not be made on a Civil Rule 12(b)(6) motion. Trustee requested leave to amend should the court determine that any additional factual allegations were required.

The bankruptcy court orally granted the motions to dismiss. The court opined that Trustee's allegation of "accounting errors" that resulted in an alleged overstatement of assets was insufficient for pleading "balance sheet insolvency". It also found that Trustee failed to plead "cash flow insolvency" because the FAC conceded the point; he acknowledged that BEI remained in business for several months after the Exchange Agreements. The court denied leave to amend on futility grounds.

**D.    Trustee's motion to reconsider**

Trustee moved to alter or amend the orders dismissing the FAC ("Motion to Reconsider"). He argued that the bankruptcy court erred by improperly inferring that BEI was not or could not have been insolvent at the time of the Exchange Agreements based on public filings and that BEI did not file for bankruptcy until a few months after the Exchange Agreements.

Trustee argued that the court also erred by determining that the FAC failed to state a plausible claim for balance sheet insolvency under

10

§ 548(a)(1)(B)(ii)(I). However, even if it did, Trustee argued that it was error to dismiss his claim under the alternative grounds for insolvency in subparts (II) and (III) without determining if he stated a plausible claim. Trustee argued that the FAC's allegations regarding BEI's struggles to pay its debt, lack of funding to continue developing works in progress, lack of income streams, and generally dire financial situation around the time of the Exchange Agreements were sufficient to plausibly show it engaged in a business for which any of its remaining property was an unreasonably small amount of capital, and that it intended to incur or believed it would incur debts beyond its ability to repay.

Lastly, Trustee argued that dismissing the FAC without leave to amend was a manifest error of law and amounted to a finding that BEI was solvent. If given the opportunity to amend, Trustee contended that he could "plead a long list of additional allegations in support of the claim," such as: "specific facts regarding BEI's balance sheet insolvency (e.g., financial data) and lack of access to capital; more specific allegations regarding its _actual_ existing assets; and more specific allegations regarding BEI's overstatement of the company's value on its disclosures due to accounting errors and likely fraudulent filings, the facts of which are still being investigated."

In opposition, Defendants argued that the court properly concluded that the self-contradictory allegations in the FAC foreclosed a plausible

11

theory of insolvency on a cash flow basis, and that the FAC contained too few factual allegations to support the conclusory assertion that BEI was balance sheet insolvent.

After a hearing, the bankruptcy court entered an order denying the Motion to Reconsider. Because Trustee had not explained to the court why the FAC did not reference the sham balance sheet and sham audit he was now asserting, it concluded that "no matter how one approaches it," Trustee's allegations of insolvency were "simply not plausible." The court opined that to grant yet another amendment of the complaint would unfairly burden Defendants who twice had to challenge the sufficiency of the complaints. This timely appeal followed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court err when it granted Defendants' motions to dismiss the FAC?

2. Did the bankruptcy court abuse its discretion when it denied Trustee leave to amend?

3. Did the bankruptcy court abuse its discretion in denying the Motion to Reconsider?

////

12

## IV. STANDARDS OF REVIEW

We review de novo the bankruptcy court's dismissal for failure to state a claim under Civil Rule 12(b)(6), and we review the denial of leave to amend a complaint for abuse of discretion. *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017).

Denial of a motion to amend or alter judgment under Civil Rule 59(e) is reviewed for an abuse of discretion. *Dixon v. Wallowa Cty.*, 336 F.3d 1013, 1022 (9th Cir. 2003). A bankruptcy court abuses its discretion if it applies the wrong legal standard, or misapplies the correct legal standard, or if its factual findings are clearly erroneous. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 (9th Cir. 2009) (en banc)).

## V. DISCUSSION

### A. Civil Rules 8 and 12

Civil Rule 8(a) (applicable here by Rule 7008) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim . . . is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).

A motion to dismiss for failure to state a claim under Civil Rule 12(b)(6) (applicable here by Rule 7012) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a

13

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Although we must accept as true all well-pleaded facts, we do not need to accept as true conclusory statements, statements of law, and unwarranted inferences cast as factual allegations. *Twombly*, 550 U.S. at 555-57; *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986) (a court need not assume the truth of legal conclusions cast in the form of factual allegations). While Civil Rule 8(a) does not require detailed factual allegations, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, it is inappropriate to assume that the plaintiff can prove facts that it has not alleged or that the defendants have violated the laws in ways that have not been alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 526 (1983).

////

14

**B.      The bankruptcy court did not err in granting the motions to dismiss the FAC.**

**1.      Section 548 and insolvency**

To plead plausible constructive fraudulent transfers claims against Defendants, Trustee had to allege facts to support the following four elements:  (1) a transfer of BEI's interest in property; (2) the transfer was made or incurred within two years before the date of the bankruptcy petition; (3) BEI received less than reasonably equivalent value in exchange for the transfer; and (4) one of three alternatives:

(I) that BEI was insolvent on the date the transfer was made or became insolvent as a result of the transfer;

(ii) that BEI was engaged in business for which any property remaining was an unreasonably small capital; or

(iii) that BEI intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

§ 548(a)(1)(B)(i)(ii)(I)-(III). The bankruptcy court dismissed the FAC on the grounds that Trustee failed to plausibly allege insolvency.

**a.      Balance Sheet Test**

A debtor is insolvent when its debts exceed its assets — the "traditional bankruptcy balance sheet test." *Akers  v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1321 (9th Cir. 1989). This test is codified at § 101(32)(A), which defines insolvency as a "financial condition such that

15

the sum of such entity's debts is greater than all of such entity's property, at fair valuation[.]" Thus, for purposes of § 548(a)(1)(B)(ii)(I), insolvency is determined using a "balance sheet test." *In re Koubourlis*, 869 F.2d at 1321. A trustee's constructively-fraudulent transfer complaint must contain enough factual information to plausibly show the debtor's liabilities exceeded assets at the time of the transfers. *Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC)*, 571 B.R. 241, 244 (Bankr. E.D. Ky. 2017).

Trustee contends that he pleaded sufficient facts in the FAC to establish BEI's balance sheet insolvency, and that the bankruptcy court should have accepted these allegations as true, drawn all inferences in his favor, and denied the motions to dismiss. Instead, he argues, the court found that it was implausible that BEI was insolvent even with knowledge of fabricated financial statements. By denying leave to amend, argues Trustee, the court ruled as a matter of law that BEI could not plausibly have been insolvent at the time of the Exchange Agreements regardless of what additional facts he could plead regarding the fraudulent financials.

Contrary to Trustee's contention, the bankruptcy court did not "find" that BEI was solvent despite the alleged fabricated financial statements; the court simply determined that the FAC failed to make a plausible case for balance sheet insolvency. In reviewing the relevant paragraphs in the FAC, the first sentence of ¶ 43 and all of ¶ 53 are either recitations of the statutory elements under § 548(a)(1)(B)(ii)(I) or conclusory statements

16

regarding BEI's insolvency that the Supreme Court has instructed "will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). While the remaining portion of ¶ 43 is more specific, the FAC did not identify which non-binding letters of intent on which energy projects were overstated in BEI's September 30, 2015 Form 10-Q (balance sheet), or the amount of the alleged overstatement. We see no error here. The FAC failed to articulate **any** amounts for BEI's assets and liabilities or allege that the overstated assets caused BEI's liabilities to exceed its assets. *See Harlan Cty. Mining, LLC v. Wrigley's 7–711, Inc. (In re Licking River Mining, LLC)*, 572 B.R. 830, 844 (Bankr. E.D. Ky. 2017) (while complaint alleged financial difficulties and identified prepetition debts, it failed to "comparably allege the value of Debtors' assets to demonstrate Debtors' insolvency.").

### b. Adequate Capital Test

Under this test, also known as the "unreasonably small capital" test, Trustee had to plead facts supporting the allegation that at the time of the transfers BEI was engaged in or about to engage in business that would leave it with an unreasonably small capital. § 548(a)(1)(B)(ii)(II). This test denotes a financial condition short of equitable or "cash flow" insolvency. *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992); *AWTR Liquidation Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 312-13 (Bankr. C.D. Cal. 2016); *Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC)*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013); *Murphy v.*

17

*Meritor Sav. Bank (In re O'Day Corp.)*,126 B.R. 370, 407 (Bankr. D. Mass. 1991) (unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually). It is "aimed at transferees that leave the transferor technically solvent but doomed to fail." *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody*, 971 F.2d at 1070 & n.22).

In determining unreasonably small capital, courts generally examine cash flow to determine whether it was "reasonably foreseeable" that the transfer at issue would lead to the debtor's "inability to generate enough cash flow to sustain operations." *Moody*, 971 F.2d at 1070; 5 COLLIER ON BANKRUPTCY ¶ 548.05[3][b] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2012) (plaintiff must show debtor's inability to generate enough cash to sustain operations). In a business setting, the aggregate amount of capital "should include . . . all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." *Moody*, 971 F.2d at 1072 n.24 (quoting Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind. L. Rev. 469, 496 (1988) (citing cases)).

Before the bankruptcy court, Trustee equated cash flow insolvency with a showing under both subparts (II) and (III) of § 548(a)(1)(B)(ii). He

18

did the same in his opening brief on appeal. In his reply, Trustee argues that the bankruptcy court considered only subpart (I) in its ruling.[3] Trustee's argument is confusing, but he appears to argue that the court failed to consider all his allegations supporting a claim under subparts (II) and (III) before dismissing the FAC. The court's finding that the FAC failed to establish cash flow insolvency appears to be directed at both subparts (II) and (III), although this is not entirely clear; the court said nothing about unreasonably small capital. While this confusion may be a basis for granting leave to amend, we conclude that the FAC did not adequately plead that the Exchange Agreements left BEI with an unreasonably small capital.

Trustee alleged ¶¶ 39, 54, and 55 to establish unreasonably small capital. However, he also alleged:

> ¶ 18. Nevertheless, BEI found two investors to provide the desperately needed cash influx to keep the company afloat for the immediate future;

> ¶ 29. Therefore, in order to finance BEI's repurchase of its BBLU shares and other securities under the Exchange Agreements, BEI had to borrow $4.9 million from [JIG], one of BEI's largest shareholders and a senior lender.

---

[3] This is part of the reason why Intracoastal filed a motion to strike Trustee's reply brief and alternatively requested leave to file a sur-reply. We DENY the motion to strike and GRANT leave to file the sur-reply.

19

The bankruptcy court considered that BEI was able to obtain cash after the Exchange Agreements by infusions from its officers and by financing from JIG. Trustee argues that it was improper for the court to "speculate" about JIG's "hypothetical" willingness to continue to loan BEI money and that BEI allegedly made some interest payments to JIG for some of its existing debts. The bankruptcy court never said that it considered in its ruling BEI's interest payments made to JIG on the $4,900,000 million loan which funded the Exchange Agreements. What it did rely on, however, and rightfully so, was Trustee's contradictory statements in the FAC that, after the Exchange Agreements, BEI was able "to turn to its existing shareholders and creditors for funds to keep the company on life support." Thus, the court did not need to speculate about JIG's willingness to loan BEI funds after the Exchange Agreements or consider any extrinsic evidence as Trustee contends it did; the FAC admitted that BEI had access to capital as of, and after, October 27, 2015.[4]

BEI's ability to obtain cash through either cash infusions from officers or by loans from creditors were allegations that the court could consider.

---

[4] While the court could consider Trustee's contradictory allegations in dismissing the FAC, we note that the October 2015 loan was a short term loan from JIG —one of BEI's largest shareholders and senior lender. One can imagine a scenario where it is possible that the loan was not indicative of BEI's ability to obtain funds to remain in business. However, it is just that, a possibility, and that is not the pleading standard. Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

*Moody*, 971 F.2d at 1072 n.24 (capital includes new equity infusions and cash from secured loans). "The ability to borrow money has considerable value in the commercial world." *Id.* at 1072-73. And, contrary to Trustee's argument, the court could also consider the allegation that BEI remained in business for five months after the Exchange Agreements. "Generally, 'courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction[.]'" *Burtch v. Opus LLC (In re Opus East LLC)*, 698 F. App'x. 711, 715 (3d Cir. 2017) (quoting *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002)) (citing *Moody*, 971 F.2d at 1074) (no unreasonably small capital where creditors were paid for twelve months after transaction); *In re Operations NY LLC*, 490 B.R. at 98 (dismissing claims for inadequate capital insolvency where transferor had assets and continued operations for ten months after the challenged transactions); *MFS/Sun Life Tr.–High*, 910 F. Supp. at 944 (company was viable for eight months after LBO); *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988) (creditors paid for ten months); *Credit Managers Ass'n of S. Cal. v. Fed. Co.*, 629 F. Supp. 175, 184 (C.D. Cal. 1985) (twelve months).

In addition, the FAC failed to allege anything about BEI's financial projections at the time of the transfers or allege that they were unreasonable. Central to a determination of whether a transaction leaves a

company with unreasonably small capital is "whether the parties' projections" used in facilitating the transaction were "reasonable." *Moody*, 971 F.2d at 1073. Finally, and something the FAC actually concedes, BEI was still attracting sophisticated investors such as Defendants at the time of the transfers, which contradicts a claim of unreasonably small capital. *See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 567 B.R. 55, 111 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) (in addition to looking at management's projections, courts also look to views of the sophisticated investors involved in the transaction); *Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *11 & n.19 (S.D.N.Y. Aug. 22, 2005) (finding it significant that "sophisticated investors with the most intimate knowledge of [the debtor's] business plan and capitalization had confidence in the company's future and certainly did not think that the company was 'undercapitalized'" because it makes "no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail").

### c. Cash Flow Test

Under the "cash flow" or "equitable" insolvency test, Trustee had to plead facts supporting the allegation that at the time of the transfers BEI intended to incur or believed that it would incur debts beyond its ability to pay as they came due. § 548(a)(1)(B)(ii)(III). "This part of the statute protects future creditors from a debtor who transfers assets with the intent to hide them or impair the debtor's ability to pay debts as they arise or with

22

the belief that inability to pay debts would likely result." *WRT Creditors Liquidation Tr. v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001).

This prong is satisfied "if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured." *Id.* at 415; *see EBC I., Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 359 (Bankr. D. Del. 2008), *aff'd*, 400 B.R. 13 (D. Del. 2009), *aff'd*, 382 F. App'x 135 (3d Cir. 2010) (same). "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." 5 COLLIER ON BANKRUPTCY at ¶ 548.05[3][c] (citing cases).

Arguably, if Trustee failed to adequately plead unreasonably small capital, then he also failed to plead cash flow/equitable insolvency. In addition to what he alleged for unreasonably small capital, Trustee alleged ¶¶ 41, 44, and 56 to establish cash flow insolvency. However, he also alleged:

> ¶ 15. During its expansion period, BEI was in constant need of cash infusions to fund its own operations and the operations of its subsidiaries until the entities could develop projects and become profitable;

23

¶ 16. BEI raised capital to fund its expansion and operations through a combination of equity sales and loans;

¶ 28. At the time the Exchange Agreements were executed, the funds gained by BEI pursuant to the October 16 SPAs had been expended in order to avoid a default on a secured debt owed by BEI that could have precipitated BEI's bankruptcy.

First, the FAC failed to allege any "facts" relating to BEI's intent to incur debt that it believed it would be unable to pay. Paragraph 56 is essentially a recitation of the statutory elements under § 548(a)(1)(B)(ii)(III). And ¶ 44 is simply incorrect, as the bankruptcy court pointed out. BEI did not "trade" $4,000,000 in cash for over $5,000,000 in debt. As Trustee also asserted in FAC, the $4,000,000 BEI raised from the SPAs had already been spent. In the Exchange Agreements, BEI took on debt to purchase equity.

Second, the FAC's allegations regarding BEI's ability to pay its future debts is deficient for the same reason that the allegations of unreasonably small capital failed. Paragraphs 16 and 28 of the FAC concede the point that BEI was able to pay its debts as they became due with cash infusions from its officers, by selling equity to investors, and by obtaining loans from creditors.

### 2. Conclusion

Accordingly, because the FAC failed to plead plausible claims for constructive fraudulent transfer against Defendants, the bankruptcy court did not err in granting the motions to dismiss and dismissing the FAC.

However, as we discuss below, the bankruptcy court abused its discretion in denying leave to amend.

**C.  The bankruptcy court abused its discretion when it denied Trustee leave to amend**.

Civil Rule 15(a), applicable here by Rule 7015, provides that leave to amend should be "freely" granted "when justice so requires." We consider five factors to assess whether the trial court properly granted or denied leave to amend pleadings:  (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended the complaint.[5] *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004). The Ninth Circuit has consistently held that a trial court abuses its discretion in denying leave to amend unless the court "'determines that the pleading could not possibly be cured by the allegation of other facts,'" *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)), or "if the plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies," *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). An amendment is futile when it is clear that amendment would not have remedied the complaint's factual deficiencies. *See Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1056 (9th Cir. 2007).

---

[5] Bad faith and undue delay are not at issue here.

Although the bankruptcy court expressed its reluctance to deny Trustee leave to amend given the extremely lenient standard, it ultimately concluded that amendment would be futile. It later noted in its ruling on the Motion to Reconsider that another amendment would "unfairly burden" Defendants. Assuming we even need to consider this later ruling, we interpret the court's "unfairly burden" finding as a finding of prejudice. While "the consideration of prejudice to the opposing party carries the greatest weight," *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003), not any prejudice will do; the prejudice must be "undue," *Foman v. Davis*, 371 U.S. 178, 182 (1962). The party opposing leave to amend bears the burden of establishing undue prejudice. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987).

We agree with the bankruptcy court's assessment that the FAC was deficient. Nevertheless, the record suggests that, if given leave to amend, Trustee could plausibly allege that BEI's financial condition was not as represented at the time of the Exchange Agreements given the allegation of fraudulent financial statements, and that the Exchange Agreements left BEI with unreasonably small capital given the allegation that BEI had to then turn to shareholders and creditors to keep the company on life support. Amendment is especially appropriate in this case, because the bankruptcy court and the parties mixed the concepts of the three distinct grounds upon which a plaintiff can establish insolvency under § 548(a)(1)(B)(ii)(I)-(III),

26

reducing them to only "balance sheet" and "cash flow" insolvency. The court's "prejudice" finding appears to be based solely on its belief that amendment would be futile, a finding which we reject. In any case, Defendants did not meet their burden to establish "undue" prejudice and we do not perceive such. Finally, that Trustee has already amended his complaint once does not amount to "several opportunities to amend [his] complaint" and "repeated[] fail[ure] to cure deficiencies." *See Telesaurus VPC, LLC*, 623 F.3d at 1003.

Accordingly, we conclude that the bankruptcy court did not appropriately exercise its discretion by denying Trustee leave to amend; his allegations were not frivolous, he endeavored to comply with the court's instruction for amending, and, most importantly, it appears that he had a reasonable chance of successfully stating a claim against Defendants if given another opportunity.

## D. Trustee waived his appeal of the reconsideration order.

Under Civil Rule 59(e), applicable here by Rule 9023, the bankruptcy court may reconsider a previous order or judgment, but only if: (1) it is presented with newly discovered evidence that was not available at the time of the original hearing; (2) it committed clear error or made an initial decision that was manifestly unjust; or (3) there is an intervening change in controlling law. *Fadel v. DCB United LLC (In re Fadel)*, 492 B.R. 1, 18 (9th Cir. BAP 2013).

27

Even though Trustee appealed the order denying his Motion to Reconsider, he did not provide any argument on the issue in his opening brief. He did argue the issue in his reply brief. Nonetheless, an appellate court in this circuit "will not review issues which are not argued specifically and distinctly in a party's opening brief." *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010). As a result, any argument on this issue has been waived.

## VI. CONCLUSION

For the reasons stated above, we AFFIRM in part, REVERSE in part, and REMAND to allow Trustee an opportunity to amend his complaint.